IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DEBRA SHUFFORD,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        CASE NO.: 2:17-cv-532-SRW
                                   )
ALABAMA MEDICAID AGENCY            )
and STEPHANIE MCGEE AZAR,          )
                                   )
        Defendants.                )

## MEMORANDUM OPINION AND ORDER[1]

## I. INTRODUCTION

Plaintiff Debra Shufford brings this action against the Alabama Medicaid Agency

and Stephanie McGee Azar in her official capacity as the Agency's Commissioner

(collectively, "defendants"). Plaintiff alleges that she was denied a promotion on account

of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et*

*seq*. ("Title VII"), and 42 U.S.C. §§ 1981 ("section 1981") and 1983 ("section 1983"). *See*

Doc. 1. Plaintiff was employed by defendant Agency from 2002 until August 1, 2017. *See*

Doc. 28-1 ¶¶ 2, 5. Plaintiff was a hired to the position of "Medicaid Administrator I" in the

Recipient Inquiry Unit and retired in the position of "Medicaid Administrator II" in the

Technical Support division. *See id.* ¶¶ 4, 6. This lawsuit concerns allegations of racial

---

[1] The parties consented to final dispositive jurisdiction by a Magistrate Judge pursuant to 28 U.S.C.
§ 636(c). (*See* Doc. 14; Doc. 15).

discrimination under Title VII for defendants' failure to promote plaintiff to a "Medicaid Administrator III" position. *See* Doc. 1 ¶ 6-18.

This action is before the court on defendants' motion for summary judgment. Doc. 22. Plaintiff filed an opposition to defendants' motion, Doc. 29, and defendants replied, Doc. 33. Upon review of the motion and the record, the court concludes that the defendants' motion for summary judgment is due to be granted.

## II. SUMMARY JUDGMENT STANDARD

A movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For summary judgment purposes, an issue of fact is "material" if, under the substantive law governing the claim, its presence or absence might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the movant fails to satisfy its initial burden, the motion for summary judgment will be denied. *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 1810 (2013). If the movant adequately supports its motion, the burden shifts to the opposing party to establish – "by producing affidavits or other relevant and admissible evidence beyond the pleadings" – specific facts raising a genuine issue for trial. *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011); *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010); Fed. R. Civ. P. 56(c)(1)(A). "All affidavits [and declarations] must be based on personal knowledge and must set forth facts that would be admissible under the Federal Rules of Evidence[.]" *Josendis*, 662 F.3d at 1315; Fed. R. Civ. P. 56(c)(4). The court views the evidence and all reasonable factual

inferences in the light most favorable to the nonmovant. *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d at 1315; Fed. R. Civ. P. 56(c)(4). However, "the nonmoving party 'must do more than show that there is some metaphysical doubt as to the material facts," and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (internal citations omitted). "If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (citation omitted) (internal quotation marks omitted).

## III. BACKGROUND AND UNDISPUTED FACTS[2]

A.    Defendants

The Alabama Medicaid Agency ("the Agency") is a governmental agency of the State of Alabama, which provides claims payment to providers of medical services in Alabama. Stephanie McGee Azar ("Azar") is the Agency's current commissioner, a position she has occupied since May 2012. Doc. 24-1 at 2-3.

---

[2] As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). These are the facts for summary judgment purposes only; they may or may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.") (citation and marks omitted). Also, the "facts" set out herein are gleaned from the parties' evidentiary submissions but not from counsels' unsubstantiated statements in the parties' briefs. "Statements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980). *See also Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

The Agency is divided into a number of programs, alternately referred to as divisions, including but not limited to, the Managed Care, Beneficiary Services, Health Management, and Program Management. *Id.* Each program or division is divided into subdivisions which are referred to as units or components. *Id.* The Managed Care division deals with the "programmatic side of handling care management or Managed Care program issues and the administration of the benefit operations of that program." *Id.* It was formed in response to response to discussions about pending legislation which would direct the Agency to develop a managed care program. Doc. 24-4 at 2. The managed care legislation, which was passed as Alabama Act Number 2013-261, also known as the Regional Care Organization legislation ("RCO legislation"), changed many of the requirements for different jobs throughout the Agency, including those in the Managed Care division. *See id.*; Doc. 24-1 at 5.

B.     Hiring Practices at the Alabama Medicaid Agency

Typically, hiring at the Agency involves the supervisor of the vacant position, the Agency's human resources department ("HR"), and the State of Alabama Personnel Department ("State Personnel"). *See* Doc. 24-6 at 3. When a position at the Agency becomes vacant, the supervisor of that position usually informs HR staff, who respond to the supervisor with a list of individuals from State Personnel – known as the "register" – who meet the minimum qualifications for the grade or job classification for the vacancy. *See id.*; Doc. 24-1 at 17. State Personnel compiles a single register for each job classification series (e.g., all "Medical Administrator II" positions) which ranks individuals by a numerical job score assigned by State Personnel based on various factors which are

relevant to each position. Doc. 24-1 at 4, 6-7, 17. However, because different positions vary even within the same job classification series, the hiring supervisor for each vacancy determines whether a given candidate has the requisite qualifications and experience for the specific position. *See* Doc. 24-6 at 3. For each position, the hiring supervisor develops what is known as a "Form 40," which describes the duties and tasks for a particular position. *See* Doc. 24-6 at 4, 11, 12.

In order to be listed on the register, individuals must fill out an application for that job classification with State Personnel, which then certifies that the applicant meets the minimum qualifications for the grade and assigns a score before placing them on the register. Doc. 24-1 at 6. Applicants are listed on the register in descending order by score, and vacancies for any given job classification may only be filled by a candidate with one of the top ten scores on the register. *Id.* at 7. The top ten candidates on the register are described as being in "Band 1." *Id.* Although HR may view the current register at any time, once a register is certified, or "pulled," a candidate in the top ten must be hired for the position. *See* Doc. 24-1 at 8; Doc. 24-6 at 3, 5, 8. While a candidate's sex is indicated on the register used to review the list of eligible candidates for a job classification, race is only indicated once the register has been pulled. Doc. 28-10 at 48. When applicants transfer from a different position in the same classification (i.e., when they are not being promoted to a new job classification), HR is not required to certify the register. Doc. 24-6 at 5. Registers are only certified at the request of the supervisor for the vacancy being filled. Doc. 24-6 at 15.

When HR is notified of a vacancy, the hiring supervisor may ask to conduct initial interviews with the top ten candidates on the register prior to the register's being pulled. *Id.* at 3. Interviews are usually held, but they are not a strict requirement to hire into a promotional position. Doc. 24-1 at 8; 24-6 at 10. After conducting initial interviews, if the hiring supervisor selects a particular candidate, HR pulls the official register. Doc. 24-6 at 3. However, the hiring supervisor may determine that none of the available candidates meets the requirements of the position. Doc. 24-6 at 8. If the register is pulled before candidates are interviewed, the top ten candidates on the register for a given job classification are notified through an availability letter, which informs the candidates that a vacancy for the job classification will be filled, and one of the top ten candidates will be hired. *See* Doc. 24-6 at 5-6. Candidates must re-apply to a job classification periodically to remain on the register for a given position to avoid having their names dropped or removed from the list. Doc. 24-6 at 10. There is no routine process whereby HR monitors the register for any given job classification, and HR does not typically notify applicants that they have fallen off the register. Doc. 24-6 at 11. However, it is the usual practice for HR to monitor the register for a particular classification approximately once or twice per week if it is aware of a vacancy or if a supervisor makes a request to be informed which names currently appear on the register. Doc. 24-6 at 8.

C.      Plaintiff's Educational and Employment Background

Plaintiff earned a Bachelor of Science degree with a minor in chemistry from the Tuskegee Institute, and a Master of Science degree from Alabama State University. Doc.

28-1 ¶ 3. She also attended the University of Alabama in Birmingham School of Dentistry for approximately one year. *Id.*

Plaintiff was first employed by the Agency in 2002 as a Medicaid Administrator I ("MA I") in the Recipient Inquiry Unit, which no longer exists. *Id.* ¶¶ 5-7. She was promoted to a Medicaid Administrator II ("MA II") position in the same unit, and later interviewed and selected to be the Associate Director of the Prior Approval Unit in the Medical Services division at the time the Recipient Inquiry Unit was being closed. *Id.* ¶ 7. Plaintiff was subsequently transferred to Eligibility division and replaced by Nancy Headley in the Prior Approval Unit. *Id.* ¶ Plaintiff later became the Regional Coordinator in the Elderly and Disabled division, before becoming the Associate Director of the Operational Readiness division. *Id.* ¶¶ 8-9.

D.     Managed Care MA III Position

In August of 2013, plaintiff responded to a job announcement for a Medical Administrator III ("MA III) position in the Managed Care division, interviewed for the position, and was not selected.

In July 2013, Georgette Harvest, the HR director for the Agency at the time, became aware that the Managed Care division would have an MA III vacancy due to the retirement of Nancy Headley, the MA III for the division. Doc. 24-6 at 4. Dr. Moon, the deputy of Managed Care, immediately began the process of trying to fill the vacancy. *Id.* The Form 40 for the position was based on the duties that Headley had previously been performing in the position. *Id.* at 5. However, due to the passage of the RCO legislation, which required the Agency to significantly expand the Managed Care program, the duties of the MA III

vacancy went beyond those of Headley, the incumbent MA III. Doc. 24-4 at 5. Headley

was a registered nurse. Doc. 24-6 at 4.

When HR was notified about the MA III vacancy in the Managed Care division by

Moon, the hiring supervisor, it first emailed all existing MA IIIs in the Agency at the time

and asked if any was interested in applying or interviewing for the position. Doc. 24-6 at

5; Doc. 28-10 at 4. No individuals occupying MA III positions in the Agency requested to

interview for the position. *Id.* Harvest then accessed the State Personnel system to view the

top ten candidates on the MA III register and emailed the candidates on July 30, 2013 to

inquire about their interest in interviewing for the vacancy. Doc. 24-6 at 5-6; Doc. 28-10

at 5-16. The email stated:

> An MA III vacancy will exist in the managed care division. Our records
> indicate that you are currently on the MA III register. If you are interested in
> interviewing for this vacancy, please contact Angela Williams no later than
> five p.m., Monday, August 5th, 2013. You are not required to send
> notification if you are not interested in interviewing for the position.
> Availability letters regarding this vacancy will not be sent to candidates on
> the register.

Doc. 24-6 at 6. All of the candidates in Band 1 of the register in July 2013 were African-

American. Doc. 24-6 at 6. Four individuals in Band 1 expressed interest in the position in

response to the email and were interviewed by Moon in August 2013: Annie Smith, Wanda

Davis, Tiffany Minnifield, and Debra Shufford. Doc. 24-6 at 7-8. All four interested

candidates were African-American women. Doc. 24-1 at 10. At the time of the interviews,

Moon possessed information about the candidates provided to him by HR and presumed

that each was among the top ten candidates on the MA III register but did not know the

candidates' job scores or rankings. Doc. 24-4 at 6. Harvest did not inform Moon of the race

or gender of the candidates prior to the interviews. 24-6 at 9. Moon was somewhat familiar with Minnifield through Minnifield's role supporting committees on which Moon served but did not have first-hand knowledge about any of the other candidates. Doc. 24-4 at 6. In his conversations with both Headley and Azar, Moon never discussed or expressed an interest in placing a specific candidate into the position. Doc. 24-1 at 10; Doc. 24-4 at 6.

On August 9, 2013, Moon emailed Shufford informing her that a decision had been made not to fill the position. Doc. 28-8. None of the interviewees were selected for the position and HR did not certify a register. Doc. 24-4 at 8; Doc. 24-6 at 8. It was Moon's assessment that, despite the urgent need to fill the open MA III position in managed care, the interviewees did not have the skills needed to perform the job. Doc. 24-4 at 8; Doc. 24-11 at 2; Doc. 28-1 ¶¶ 33-34. After deciding not to fill the opening with any of the available candidates, Moon indicated to Harvest that he may try to change the position or redefine some tasking duties and emphasized that he really wanted the qualifications and experience of a nurse for some of the duties, tasks, and functions in Managed Care. Doc. 24-6 at 9.

E.       Transfer and Promotion of Jerri Jackson

On August 14, 2013 Harvest sent a memo to Jerri Jackson, transferring her from the Medical Services division to the Managed Care division, reporting to Moon as an MA II. Doc. 24-6 at 9; Doc. 24-8. The transfer was effective August 16, 2013. *Id.* Moon had been familiar with Jackson through her work in the hospital program division, Doc. 24-4 at 9, and had requested Jackson's transfer directly, Doc. 24-6 at 8. Jackson was a nurse who worked in Medical Services. Doc. 24-6 at 8. Moon did not need to permission or approval to transfer Jackson because Medical Services were under his purview, and no interview or

other procedure was necessary. *See* Doc. 24-6 at 9. Jackson was transferred because her expertise was valuable to Managed Care given the reorganization that resulted from the passage of the RCO Legislation. *See* Doc. 24-1 at 12; 24-4 at 9.

On December 10, 2013, Jackson was promoted to the MA III job classification within the Managed Care division, effective December 16, 2013. Doc. 24-14. At the time of her promotion to MA III, Jackson's standing on the register was ninth. *Id.*; Doc. 24-6 at 12; 28-10 at 34. In July 2013, when Harvest first reviewed the list of eligibles on the MA III register for the purpose of filling the Managed Care position, Jackson was not among the top ten candidates listed on the MA III register. Doc. 24-6 at 8. A prior MA III register which had been pulled for a different position on November 14, 2013 did not show Jackson in the top ten. Doc. 28-10 at 35. Jackson is a Caucasian woman. Doc. 24-1 at 13.

F.      Plaintiff's EEOC Charges and Federal Complaint

On May 24, 2014, plaintiff filed a charge of racial discrimination and retaliation which was received by the Equal Employment Opportunity Commission ("EEOC") and stamped on June 2, 2014. Doc. 24-15. In her charge, plaintiff stated that she "applied for a promotion … [and] was ranked amongst the ten most qualified persons for the position" and that "the individuals who ranked in the top ten were black." Doc. 24-15 at 1. Plaintiff further stated that "[d]uring the interview the interviewers seemed disinterested in my responses" and she "believe[d] that Ms. Jackson was moved under Ms. Headley's supervision so that she could gain experience needed to perform the duties associated with Ms. Headley's position." *Id.* The charge states that when Jackson was promoted to MA III

in the Managed Care division, "[t]he position was not posted, and [neither plaintiff] nor any of the other [b]lack employees that [sic] were considered for the position." *Id.* at 2.

On August 7, 2017, plaintiff filed the present action, alleging race discrimination arising from her non-selection for the Managed Care MA III position, in violation of Title VII and sections 1981 and 1983. Plaintiff requests a declaratory judgment "that the employment policies, practices, procedures, conditions and customs of the defendants are violative of the rights of the plaintiff as secured by Title VII," a permanent injunction "enjoining the defendants … from continuing to violate Title VII," an "order requiring the defendants to make the plaintiff whole by awarding her the position she would have occupied in the absence of race discrimination, back-pay (plus interest), front-pay, punitive and compensatory damages and/or nominal damages, declaratory and injunctive relief, and benefits," and "such other relief and benefits as the cause of justice may require, including but not limited to, an award of costs, attorney's fees and expenses." Doc. 1 at 4.

## IV. DISCUSSION

A.    Title VII and 42 U.S.C. §§ 1981/1983 Standards

1.    Methods of Proof and Burdens

Plaintiff brings her failure-to-promote claim under Title VII, sections 1981 and 1983. "Where … a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claim are identical." *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (citing *Lincoln v. Bd. of Regents*, 697 F.2d 928, 935 n.6 (11th Cir. 1983)). *See also Peterson v. Bd. of Trs. of the Univ. of Ala.*, 644 F. App'x 951, 955 (11th Cir. 2016); *Kidd v. Jasper*, 2018 WL

2766058 *6 (N.D. Ala. 2018). For disparate treatment claims without direct evidence of discrimination, both section 1981 and 1983 claims are analyzed under the same burden-shifting framework used for Title VII claims, which was established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993) (assuming that *McDonnell Douglas* applies to section 1983 disparate treatment claims); *Turnes v. Amsouth Bank N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994) (Applying the *McDonnell Douglas* framework to section 1981 disparate treatment claims (citing *Howard v. BP Oil Co., Inc.*, 32 F.3d 520 (11th Cir. 1994))). Under *McDonnell Douglas*:

> [T]he plaintiff must establish by preponderance of the evidence a prima facie case of discrimination. If she does, the burden of production shifts to the employer, which requires the employer to introduce evidence of some legitimate, nondiscriminatory reason for its employment decision. If the employer satisfies its burden, the presumption raised by the prima facie case is rebutted. Because the burden of persuasion remains with the employee, she must then show that the seemingly legitimate reason the employer gave was pretextual — i.e., the proffered reason was not the true reason for the employment decision — in other words, the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against [her] on the basis of a protected personal characteristic.

*Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013) (internal citations and quotation marks omitted).

2.    Eleventh Amendment Immunity for §§ 1981 and 1983

"The Eleventh Amendment bars suits directly against a state or its agencies, regardless of the nature of relief sought." *Blackledge v. Ala. Dep't of Mental Health & Mental Retardation*, 2007 WL 3124452 *8 (M.D. Ala. 2007). And while "[a]n exception to Eleventh Amendment immunity … applies in suits against a state official seeking

prospective equitable relief to end continuing violations of law, … the only official-capacity claims which may be pursued consistent with the Eleventh Amendment are ones for prospective injunctive or declaratory relief." *Id.*

Here, plaintiff seeks injunctive relief against Azar in her official capacity from continuing violations of § 1981 as enforced through § 1983. Defendants contend that both the Agency and Azar are entitled to Eleventh Amendment immunity for plaintiff's section 1981 and 1983 claims. Defendants also contend that Azar is not a "person" for the purposes of section 1983 monetary relief. The court agrees that the Eleventh Amendment bars any claim against the Agency and for monetary relief against Azar in her official capacity, and that injunctive relief is available to plaintiff against Azar to the extent that plaintiff's prayer for relief does not related to purposed past violations of § 1981 by Azar in her official capacity. Defendants' motion for summary judgment premised on Eleventh Amendment immunity for monetary damages under sections 1981 and 1983 is due to be granted.

3.    Title VII Official Capacity Claims Against Azar

The Eleventh Amendment does not bar suits against state agencies for Title VII claims. *See Allen v. Alabama State Bd. of Educ.*, 816 F.2d 575, 577 (11th Cir. 1987). And, where the employer is party to a Title VII suit, Title VII claims against a state official in her official capacity are redundant. *Blackledge*, 2007 WL 3124452 at *9 (collecting cases).

Plaintiff seeks monetary relief under Title VII against the Agency and Azar, in her official capacity as an employee of defendant Agency. Therefore, plaintiff's Title VII claim against Azar in her official capacity is redundant and summary judgment is due to be entered for defendants on plaintiff's Title VII claim against Azar.

B.     Failure to Promote

1.     Title VII Administrative Requirements

"Before a plaintiff may pursue a Title VII discrimination claim, [she] first must exhaust [her] administrative remedies. To exhaust [her] remedies, the plaintiff must file a timely charge of discrimination with the EEOC. To be timely within a non-deferral state, such as Alabama, it must be filed within 180 days of the last discriminatory act." *Price v. M & H Valve Co.*, 177 F. App'x 1, 9 (11th Cir. 2006) (internal citations omitted). *See also Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001). Additionally, the EEOC must issue notice of a plaintiff's right to sue, and a civil action must be brought within ninety days after issuance of such letter. *See Miller v. George*, 223 F. App'x 842, 844 (11th Cir. 2007); *Brown v. Huntsville City Bd. of Educ.*, 324 F.R.D. 239, 249 (N.D. Ala. 2018). "[T]he procedural requirement of exhausting administrative remedies with the EEOC prior to filing a civil suit is not a jurisdictional requirement, it is a defense that may be waived by the defendant." *Thaggard v. State Dep't of Youth Servs.*, 2008 WL 4629929 *4 (M.D. Ala. 2008) (citing *Solomon v. Hardison*, 746 F.2d 699, 701 (11th Cir. 1984)).

Jackson's promotion, which plaintiff alleges to have been a discriminatory act by the Agency, was effective on December 16, 2013, and plaintiff's charge of discrimination was received by the EEOC on June 2, 2014, 168 days later. It is undisputed that plaintiff filed her EEOC charge within 180 days of the alleged discriminatory act by the Agency. Plaintiff's complaint alleges that it is filed within 90 days of her receiving a right to sue letter from the EEOC, and defendants deny the allegation. Plaintiff offers no evidence as to the date on which she received the letter. However, defendants' motion for summary

14

judgment is silent on the issue of administrative exhaustion. Therefore, the court deems defendants to have waived any affirmative defenses relating to the timeliness of plaintiff's EEOC charge, the EEOC's issuance of a right to sue letter for plaintiff's Title VII claim, and the timeliness of plaintiff's complaint. *See Hill v. Board of School Com'rs of Mobile County, Ala.*, 2014 WL 1604004, at *6 (S.D. Ala. 2014)(defendant did not raise the affirmative defenses of exhaustion and statute of limitations "in either a motion to dismiss or in the motion for summary judgment. Thus, the Court finds that [defendant] has waived its affirmative defense of statute of limitations and its affirmative defense of failure to exhaust administrative remedies on basis that [defendant] was not named in the amended EEOC charge."); *Ham v. City of Atlanta, Georgia*, 2009 WL 10668310, at *7 (N.D. Ga. 2009) ("[B]ecause exhaustion is not a jurisdictional requirement and is subject to waiver, defendants have waived this argument by not timely raising it in their motion for summary judgment.")(citations omitted).

  2. Statute of Limitations for §§ 1981 and 1983

  "A § 1981 claim brought against a state actor pursuant to § 1983 is subject to the statute of limitations governing § 1983 claims." *Blackledge*, 2007 WL 3124452 *10. As with Title VII's administrative exhaustion requirements, the statute of limitations is an affirmative defense which is waived if not raised. *See id.* (citing *Day v. Liberty Nat'l Life Ins. Co.*, 122 F.3d 1012, 1015 (11th Cir. 1997)).

  Plaintiff does not make any assertions as to the timeliness of her §§ 1981 and 1983 claims, and defendants do not raise the statute of limitations as a defense. Therefore, the

court considers defendants to have waived any affirmative defense relating to the statute of limitations for plaintiff's §§ 1981 and 1983 claims.

3.  Plaintiff's *Prima Facie* Case

"To make out a prima facie case in a failure to promote case, the plaintiff needs to show, among other things, that she 'applied for and was qualified for a promotion.'" *Mando*, 731 F.3d at 1204 (quoting *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010)). Under Eleventh Circuit precedent, an employee is considered qualified for a promotion if the employee offers evidence that she satisfies an employer's qualifications. *Id.* (quoting *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005) (per curiam)). But if the qualifications are not objectively verifiable or easily obtainable or within the plaintiff's possession, the plaintiff need not make out that portion of the *prima facie* case.

Here, defendants assume that plaintiff can prove a *prima facie* case. Doc. 23 at 18. As plaintiff's *prima facie* case stands unrebutted, the court finds for present purposes that those elements are satisfied. The court's review is therefore confined to whether defendants have articulated a legitimate, nondiscriminatory reason for their employment decision, and if so, whether plaintiff has produced sufficient evidence to raise a genuine issue of material fact on the question of pretext.

4.  Defendant's Proffered Legitimate, Non-Discriminatory Reason

"Once the employee makes out a prima facie case the burden shifts to the employer to articulate a non-discriminatory reason for the adverse employment decision." *Mando*, 731 F.3d at 1205. The employer's burden is one of production, not persuasion, and "the

employer's reason need only be specific enough so that the 'plaintiff is afforded a full and fair opportunity to demonstrate pretext.'" *Id.* (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1034 (11th Cir. 2009)). If the employer meets its burden of production, the burden shifts back to the plaintiff to produce evidence that would be "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman*, 229 F.3d at 1024. As the Eleventh Circuit explained in *Mando*:

> [I]n enacting Title VII Congress did not intend to transform federal courts into a super-personnel department that reexamines an entity's business decisions. Our job is instead to determine whether the employer gave an honest explanation to justify its hiring decisions. If the employer gives one, we're not in a position to second-guess [its] business judgment.

731 F.3d at 1207 (internal citations and quotation marks omitted).

Here, the Agency specified that due to a "complete change to its delivery system; from a fee-for-service payment methodology, to a Regional Care Organization delivery/payment system … it was essential that the [Managed Care MA III position] [had] significant experience working with, among other things, medical related issues within the Agency." Doc. 24-11 at 2. The Agency stated that "simply qualifying for the MA III register does not mean you are appropriate, or the most qualified candidate, for an appointment"; that its decision to promote Jackson to the Managed Care MA III position was a decision to "hire the person best qualified for the position"; and that plaintiff "did not possess the experience on the medical side that Ms. Jackson possessed." *Id.* at 4. Upon concluding its interviews in July 2013, the Agency "determined that no candidate, including Ms. Shufford, possessed the necessary skill set, experience or qualifications to

fulfill the obligations" of the MA III vacancy in the Managed Care division. *Id.* at 2.

Regarding Jackson's transfer to the Managed Care division as an MA II, the Agency stated

that "in an effort to prevent a delay in the performance of day to day activities [in the

Managed Care division] … Jerri Jackson[,] who possesses several years of experience in

the Medical Services area was moved to assist the Medical Director in the Managed Care

area" and that because Jackson "already possessed extensive experience working in

Medical Services … her transition to Managed Care would allow for day to day activities

to continue, it was not to gain experience." *Id.* Regarding Jackson's subsequent promotion

to the MA III position in Managed Care, the Agency stated that:

> Although Ms. Jackson was qualified and met the minimum requirements at
> the time Ms. Shufford and others interviewed for the MA III vacancy; Ms.
> Jackson was not in the top ten list of eligible candidates. As stated above, the
> movement of Ms. Jackson to this area was not done to allow her to gain
> experience; Ms. Jackson already had the necessary experience and
> qualifications. Nor did the movement to this position contribute to her being
> in the top ten of eligible candidates at the time of her promotion to the
> vacancy. In fact, had these been the reasons for Ms. Jackson's move, instead
> of interviewing candidates in August, 2013, Medicaid could have waited
> until Ms. Jackson was in the top 10, which occurred approximately 4 months
> later, and then simply given her the position; as an interview is not required.

*Id.* at 2-3. Thus, defendants have sustained their burden of production under *McDonnell*

*Douglas* and, therefore, the burden shifts back to the plaintiff to prove that defendants'

stated reasons were pretextual.

    5.    Pretext

A plaintiff may demonstrate that an employer's proffered, non-discriminatory

reasons were pretextual by revealing "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in [its] proffered legitimate reasons for its actions that a

18

reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *cert. denied*, 546 U.S. 960 (2005) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). "In the context of a promotion, 'a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (quoting *Alexander v. Fulton Cty.*, 207 F.3d 1303, 1339 (11th Cir. 2000)). A plaintiff must show that a defendant's employment decisions were motivated by race and that "the disparities between the successful applicant's and his own qualifications 'were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Id.* (quoting *Cooper*, 390 F.3d at 732).

Plaintiff attempts to prove pretext by claiming that she was equally qualified for the MA III position, and that the interview process was manipulated to avoid promoting an African American individual. She testifies that after reviewing the Form 40 for the Managed Care MA III position after Jackson was hired, she "believe[d] [she] possess the skill set necessary to qualify for that job" and she "believe[d] the skills which qualified me for the Prior Approval job that Headley held immediately after [her] qualified [her] for the MA III position that Headley left in 2013." Doc. 28-1 ¶ 38. She states that because she ranked in the top ten of the MA III register at the time of her interview with Moon, she possessed the skill set for the position according to the state, that she informed Moon about her previous experience in the Medical Services department, and that, like Headley, the former Managed Care MA III, she had worked with people and providers all over the state.

19

*Id.* at ¶¶ 20, 22. Plaintiff also alleges that Moon's emphasis on Headley's reputation, Headley's lack of direction and instructions regarding the role, and Moon's behavior during the interview indicated that she "did not think [she] would get the job." *See id.* at ¶¶ 15-32.

Plaintiff avers that because "Headley had been promoted to the MA III position directly from a [sic] MA II position in Prior Authorization that she assumed from Shufford," Shufford was definitely qualified to be placed into the MA III position upon Headley's retirement. Doc. 29 at 21. Plaintiff further alleges that because the interview process was different from her prior experiences at the agency, and because Jackson was transferred into the Managed Care as an MA II and promoted without any notice to other individuals on the MA III register, the register system was manipulated, and Moon ignored Shufford's qualifications for the position. *Id.* at 22-24.

In response, defendants note Jackson's nursing degree and extensive nursing experience up to and including her work at the Agency. Doc. 33. As discussed above, Moon's evaluation of the interviewed candidates, including Shufford and Jackson, determined that Jackson's skills and abilities met the needs of the Managed Care MA III position. Plaintiff has not shown that she was equally or better qualified than Jackson, or that the disparities between the successful applicant's and her own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff. Therefore, the plaintiff has not met her burden of proving that defendants' proffered reasons for not promoting her were a pretext for discrimination.

## V. CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

Defendants' motion for summary judgment is GRANTED, and summary judgment is hereby entered in defendants' favor on all claims.

The Clerk of Court is DIRECTED to close this file.

Done, on this the 30th day of January, 2019.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge